## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF GEORGIA
## ALBANY DIVISION

| | |
|---|---|
| TEIJAH BALL, | : |
| | : |
| Plaintiff, | :     CASE NO.: 1:23-cv-108 |
| | : |
| v. | : |
| | : |
| PERDUE FARMS, INC., and | : |
| A SERVICES ACQUISITION, LLC, | : |
| | : |
| Defendants. | : |

## COMPLAINT

Plaintiff Teijah Ball brings this action against Defendants Perdue Farms, Inc., and A Services Acquisition, LLC (collectively, "Defendants").

## PARTIES

1.

Ball is a citizen of the United States and lives in Crisp County, Georgia, where she has resided at all times relevant to this suit. She submits herself to the jurisdiction of this Court.

2.

Perdue Farms, Inc. ("Perdue"), is a foreign profit corporation with its principal place of business in Maryland. This Defendant may be served by personal service of process upon registered agent CT Corporation System, 289 S. Culver Street, Lawrenceville, Georgia 30046.

3.

A Services Acquisition, LLC, d/b/a A Services Group ("ASG"), is a foreign limited liability company with its principal place of business in South Carolina. This Defendant may

be served by personal service of process upon registered agent CT Corporation System, 289 S. Culver Street, Lawrenceville, Georgia 30046.

4.

Defendants are subject to the jurisdiction of this Court.

5.

Service and process are timely, valid, and appropriate in all respects.

## JURISDICTION AND VENUE

6.

Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343 (civil rights), 28 U.S.C. § 1367 (supplemental jurisdiction).

7.

Ball's claims arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") and Georgia state law.

8.

Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in the United States District Court for the Middle District of Georgia because a substantial part of the events or omissions giving rise to the claims contained in this complaint occurred therein.

9.

Pursuant to M.D. Ga. L.R. 3.4, the Albany Division of this Court is the proper venue for this action because Ball resides in Crisp County, Georgia.

10.

Both Defendants are covered employers under Title VII.

## STATEMENT OF FACTS

11.

Perdue operates a chicken processing plant in Perry, Georgia.

12.

Perdue uses temporary labor through staffing companies, including ASG.

13.

Ball was hired by ASG and staffed at Perdue beginning in May 2022.

14.

Ball was instructed to work in an area of the facility called "Chic-Fil-A – DSI department" ("CFA Department").

15.

The CFA Department has a line with employees working practically shoulder to shoulder.

16.

The employees on the line in the CFA Department are mostly female.

17.

One of the few males in the CFA Department is convicted murderer Demetrious Johnson ("Johnson").

18.

Johnson served 30 years in prison for murder, aggravated assault, and weapons violations.

19.

Perdue hired Johnson on September 29, 2020, before he was officially released from custody per the Georgia Department of Corrections website.

20.

Johnson controlled Ball's time, manner, and method of employment on behalf of Perdue.

21.

Johnson had the authority to hire, fire, promote, demote, discipline, or transfer Ball.

22.

Starting immediately, Johnson made frequent attempts to talk to Ball while she worked. For instance, he bragged about accumulating $10,000.00 while working for Perdue in a half-way house because he was not allowed to spend his wages.

23.

Johnson made frequent sexual comments, such as:

- "Are you gay?" – in Johnson's effort to understand why Ball was not interested in him romantically.
- "Some of y'all women just need your asshole licked, maybe y'all wouldn't act the way you act."
- "[You have] big juicy ass lips, I wonder how the other ones look and taste."
- A description of how he "fucked [his girlfriend, another Perdue employee] in the asshole."

- He was not concerned about Ball's boyfriend because he "did 25-30 years in prison for killing someone and [would] do it again."
- "Have you ever had sex with an older man?"
- "Have you ever had your [private area] eaten from behind?"

24.

On or about May 14, 2022 – after incessant sexual and threatening comments from Johnson – Ball informed two HR representatives of her need to make a complaint; the HR representatives told Ball to return at the end of her shift and that she was not permitted to make a complaint before that time.

25.

At the end of Ball's shift on or about May 14, 2022, she returned to HR, but the office was closed.

26.

Over the weekend, Ball started exhibiting symptoms and illness and went to an urgent care and received an out-of-work excuse for two weeks as the result of a positive covid diagnosis.

27.

When Ball sent the work excuse to Defendants, she was told she had been removed from the employee system because she was on "covid leave" and, as a result, could not file a sexual harassment complaint against Johnson.

28.

Defendants terminated Ball effective May 25, 2022, for job abandonment before realizing that she had given a covid-related work excuse to a superior.

29.

Because Ball did not abandon her job and, instead, followed company protocol regarding covid illness, Defendants "rehired" Ball and she returned to work on June 3.

30.

Ball worked on June 3 and June 7.  Due to Johnson's presence and/or ongoing harassment, Ball left the line without advising her harasser, Line Lead Demetrious Johnson, to hide in the bathroom for approximately 15-20 minutes to get a break from his harassing behavior.

31.

On June 7, 2022, in response to Ball going to hide in the bathroom, Johnson told her to "get the fuck off my line" and that he controls where she is required to work.

32.

On June 8, 2022, Ball and R.W., another employee who was harassed by Johnson, arrived to work on Johnson's line but there was no room for them to work so they decided to go to HR together.

33.

Upon seeing Ball and R.W. leaving the floor together, Johnson began apologizing and interacting with them to dissuade them from going to HR.

34.

On the way to HR, Johnson's girlfriend confronted Ball and R.W. to ask what was happening.

35.

Ball responded to Johnson's girlfriend by explaining all the things that Johnson said to her, R.W., and other women in the CFA Department.

36.

In explaining the situation, Ball used the same profane and sexual words that Johnson had been using to harass her, R.W., and other women in the CFA Department.

37.

Johnson's girlfriend was embarrassed that Ball explained Johnson's behavior in front of other employees, so she went to HR.

38.

Upon hearing about the confrontation, HR terminated Ball and R.W. and escorted them off the premises.

39.

When Ball started working on the line in the CFA Department, Perdue was already aware Johnson was making the workplace sexually charged and condoned it.

40.

Notwithstanding Perdue's attempts to minimize the authority it gave to a convicted murderer over a mostly female production line, Johnson was Ball's supervisor for purposes of Title VII and this lawsuit.

## **COUNT ONE**

Title VII Sexual Harassment

Against All Defendants

41.

As a female, Ball is a member of a class protected by Title VII.

42.

Defendants are covered employers under Title VII.

43.

Defendants were joint employers of Ball at all times relevant in that they shared or co-determined the essential terms and conditions of Ball's employment.

44.

Johnson was Ball's supervisor at all times relevant.

45.

Defendants are strictly liable for Johnson's conduct.

46.

Defendants were negligent either in discovery or remedying the harassment.

47.

Ball and other employees made a concerted effort to inform Defendants that a problem existed with convicted murdered Demetrious Johnson sexually harassing women in the CFA Department.

48.

Even if Johnson was not a supervisor, he knew he was sexually harassing female employees and, per Perdue and his job description, had a duty to convey that information to Defendants so they could remedy the situation.

49.

Defendants had actual and constructive knowledge of the sexual harassment.

50.

Ball was subject to unwelcome sexual harassment.

51.

Ball did not solicit or incite the sexual harassment, and she regarded the sexual harassment as undesirable or offensive.

52.

Ball would not have been subjected to unwelcome sexual harassment if she was not female.

53.

The harassment was sufficiently severe and persistent to alter the conditions of employment and create an abusive working environment.

54.

By not allowing Ball to make a complaint of sexual harassment, Defendants, as a matter of fact and law, required sexual consideration from Ball as a quid pro quo to be permitted to continue to work at Perdue.

55.

Defendants allowed Johnson to make a sexually hostile work environment for Ball, refused to allow her to make a complaint, supported Johnson's declaration for Ball to "get the fuck off my line," and terminated Ball and another victim of Johnson's sexual harassment.

56.

Ball was terminated as a result of the sexual harassment she endured.

## COUNT TWO

Title VII Sex Discrimination

Against All Defendants

57.

As a female, Ball is a member of a class protected by Title VII.

58.

Defendants are covered employers under Title VII.

59.

Defendants were joint employers of Ball at all times relevant in that they shared or co-determined the essential terms and conditions of Ball's employment.

60.

Ball was qualified for the job from which she was terminated.

61.

Ball was terminated from the job despite being qualified for the position.

62.

Defendants did not require males to endure sexual harassment.

63.

Defendants allowed males to make complaints of workplace misconduct.

64.

Ball's sex was a motivating factor for her termination by Defendants.

65.

Ball is entitled to Title VII damages pursuant to, among other statutes, 42 U.S.C. § 2000e-5.

## COUNT THREE

Title VII Retaliation

Against All Defendants

66.

As a female, Ball is a member of a class protected by Title VII.

67.

Defendants are covered employers under Title VII.

68.

Defendants were joint employers of Ball at all times relevant in that they shared or co-determined the essential terms and conditions of Ball's employment.

69.

Ball engaged in statutorily protected activity by making attempting to make a sexual harassment complaint against Johnson to HR.

70.

Although Defendants did not allow Ball to make a formal sexual harassment complaint, they terminated her on May 25, 2022, re-hired her when they discovered there was no legitimate basis for the termination, allowed Johnson to dictate her job placement, then terminated her following a confrontation initiated by Johnson's girlfriend.

71.

As a result of the above, Defendants are liable to Ball for Title VII retaliation.

## COUNT FOUR

Intentional Infliction of Emotional Distress

Against All Defendants

72.

Johnson's actions are imputable to Defendants.

73.

Defendants acted intentionally or recklessly by allowing Johnson to hire, fire, promote, demote, discipline, or transfer Ball and other female employees in the CFA Department.

74.

Defendant acted intentionally or recklessly by allowing Johnson to create a sexually hostile work environment that was used to threaten and intimidate female employees.

75.

Defendants acted intentionally or recklessly by refusing to allow complaints of sexual harassment to be made against Johnson and by allowing him to continue to sexually harass Ball and her female co-workers.

76.

Defendants' conduct was extreme and outrageous.

77.

Ball's resulting emotional distress was severe.

78.

Defendants' conduct caused severe emotional distress.

79.

Defendants are, therefore, liable for intentional infliction of emotional distress.

## **PRAYER FOR RELIEF**

WHEREFORE, Ball demands a TRIAL BY JURY and the following relief:

(a) Declaratory judgment that Defendants' actions violated Ball's Title VII rights;

(b) Full back pay from the date of the adverse employment action taking into account all raises to which Ball would have been entitled but for Defendants' unlawful activity, and all fringe and pension benefits of employment, with prejudgment interest thereon;

(c) Front pay to compensate Ball for lost future wages, benefits, and pension;

(d) Compensatory damages in an amount to be determined by the enlightened conscience of the jury for Ball's emotional distress, suffering, inconvenience, mental anguish, loss of enjoyment of life, and special damages;

(e) Award of costs and expenses of this action, together with reasonable attorney and expert fees;

(f) Punitive damages in an amount to be determined by the enlightened conscience of the jury sufficient to punish Defendants for their conduct toward Kingdom and deter Defendants from similar conduct in the future;

(g) Judgment against Defendants for damages incurred by Ball;

(h) Judgment against Defendants in an amount to fully and adequately compensate Ball;

(i) A trial by jury on all issues triable to a jury; and

(j) Other and further relief as the Court deems just and proper.

Respectfully submitted this 18th day of July 2023.

                                                  DEAN THAXTON, LLC

By:    s/ Douglas H. Dean, Esq.
        Georgia Bar No. 130988
        601 E. 14th Avenue (31015)
        Post Office Box 5005
        Cordele, Georgia 31010
        O: (229) 271-9323
        F: (229) 271-9324
        E: *doug@deanthaxton.law*